Filed 12/9/20  In re S.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re S.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>G.P. et al.,<br><br>    Defendants and Appellants. | E075293<br><br>(Super.Ct.Nos. J281407 & J281408)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant G.P.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant A.C.

1

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

G.P. (mother) and A.C. (father) are the parents of S.P. and J.C.  In June 2019, at the time of S.P.'s birth, both mother and S.P. tested positive for amphetamines, and both S.P. and J.C. were taken into temporary custody by San Bernardino County Children and Family Services (CFS).  Upon confirmation that both mother and father had previously had children removed from their custody and that parental rights had been terminated in those cases, the juvenile court denied reunification services to both mother and father pursuant to Welfare and Institutions Code[1] section 361.5, subdivision (b)(10), (11), and (13).  Following a contested permanency planning hearing, the juvenile court terminated parental rights and selected a permanent plan of adoption for both S.P. and J.C.

On appeal, mother argues (1) the juvenile court abused its discretion when it summarily denied a petition pursuant to section 388 to reinstate reunification services at the time of the permanency planning hearing, and (2) the juvenile court abused its discretion by failing to apply the beneficial parent-child relationship exception to the termination of her parental rights.  Additionally, both mother and father argue the matter must be remanded for alleged failure to comply with the Indian Child Welfare Act of 1978.  (ICWA; 25 U.S.C. § 1901 et seq.)  We find no abuse of discretion on this record

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

and, additionally, conclude mother and father have not established error under ICWA warranting reversal.

## II. FACTS AND PROCEDURAL HISTORY

A. *Facts*

S.P. is the daughter of mother and father. In June 2019, shortly after S.P.'s birth, CFS received an immediate response referral when both mother and S.P. tested positive for amphetamines. Following initial interviews by the social worker in which both mother and father admitted to frequent methamphetamine use during mother's pregnancy with S.P., both mother and father signed voluntary declarations permitting CFS to take S.P. and her older brother, J.C., into temporary protective custody. On June 19, 2019, CFS filed dependency petitions on behalf of both S.P. and J.C., followed by amended petitions on July 10, 2019.

The amended petitions alleged that both mother and father had an extensive history of substance abuse resulting in the failure to protect and the inability to adequately care for S.P. and J.C. It was further alleged that two older siblings, E.P. and C.C., had previously been removed from mother and father, that both mother and father failed to reunify in those cases, and that both mother and father had their parental rights terminated as to the two older siblings. On that basis, CFS asserted jurisdiction pursuant to section 300, subdivisions (b) and (j).

B. *Jurisdiction and Disposition Report*

On July 8, 2019, CFS filed a jurisdiction/disposition report. The report recommended finding jurisdiction based upon the allegations of the amended petitions

3

and further recommended that reunification services be denied for both mother and father based upon section 361.5, subdivision (b)(10), (11), and (13).

The report summarized an interview with mother wherein mother admitted she had an extensive history involving methamphetamine use; denied having an "ongoing problem" with substance abuse; stated that following the removal of C.C., she had maintained sobriety for six years; acknowledged that she relapsed twice during her pregnancy with S.P.; and further admitted she did nothing to address the problem upon relapse. Mother reported that following the removal of S.P. and J.C., she began participating in a perinatal program that included a substance abuse component, counseling, and parenting education. Mother also described father as "the biggest meth user I know" and appeared to partially blame father for her relapse. She reported that father did not assist with finances, and that she was never comfortable leaving J.C. in father's care.

The report also summarized an interview with father wherein father admitted he knew of mother's past substance abuse problems; denied knowledge of mother's relapses during her pregnancy with S.P.; and admitted he had a prior substance abuse problem but denied he had any current issues with substance abuse. Father acknowledged having taken a drug test at the time of S.P. and J.C.'s detention hearing and expressed the belief he had tested negative, despite the fact that he actually tested positive for amphetamines. He did not commit to taking another drug test when asked by the social worker, citing a lack of transportation as the reason. Father admitted that two children had previously

4

been removed from his custody and his parental rights had been terminated with respect to both of those children.

The report confirmed that in 2004, another child, E.P., had been removed from mother; that reunification services and mother's parental rights had been terminated in that case; and that E.P. had since been adopted by a family member. E.P. was removed due to mother's use of methamphetamines and Vicodin; the presence of drugs within access of her children; and mother's failure to participate in substance abuse programs or drug tests during the reunification process.

The report also confirmed that in 2012, another child, C.C., had been removed from mother and father; that reunification services and parental rights had been terminated in that case; and that C.C. had since been adopted by a nonrelative. C.C. was removed because both mother and father were dealing with substance abuse issues, and neither had an appropriate home to care for C.C. at the time. Mother was not offered reunification services, and father failed to reunify after being offered services.

Finally, the report confirmed that in 2012, another child, A.C., had been removed from father; that reunification services and parental rights had been terminated in that case; and that A.C. had since been adopted. A.C. is the child of father and another woman and was removed due to general neglect. Father's reunification services and parental rights were terminated following his failure to participate in counseling, parenting classes, and drug treatment.

C.  *Subsequent Reports*

On July 11, 2019, CFS filed an additional information to the court or form "CFS 6.7" (CFS 6.7), showing various attempts to place the children with known family members and describing the reasons why such attempts had not yet proven successful.

On September 20, 2019, CFS filed another CFS 6.7 form.  This CFS 6.7 form represented that mother had initially enrolled in a perinatal program, but that she had since been terminated due to a positive drug test, refusal to undergo further drug testing, and attendance issues.  Additionally, mother tested positive for amphetamines on four of the six random drug tests conducted since J.C. and S.P.'s detention, with the results from the remaining two tests still pending.  The CFS 6.7 further represented that father had failed to participate in any of the services previously referred by CFS.  Father tested positive for amphetamines in four of the five random drug tests conducted since J.C. and S.P.'s detention, with the results from the last test still pending.  While both parents participated in court-ordered visitation with the children, observers noticed father was "very sleepy and falls asleep during the visits," and on one occasion was "profusely sweating and sleepy," leading observers to believe he may have been under the influence during visitation.

D.  *Dispositional Hearing*

On September 25, 2019, the juvenile court held a contested jurisdiction/disposition hearing and admitted CFS's detention reports; jurisdiction/disposition reports; and CFS 6.7's as evidence.  The juvenile court found true the jurisdictional allegations of the amended petition; ordered the children removed pursuant to section 361, subdivision (c);

denied reunification services pursuant to the bypass provisions of section 361, subdivision (b)(10), (11), and (13); and set the matter for a permanency planning hearing under section 366.26. In support of its denial of reunification services, the juvenile court found true the allegations that both parents had previously had children removed and parental rights terminated, and that the parents had not presented clear and convincing evidence that reunification would be in the best interest of either child.

E. *Mother's Section 388 Petition*

On June 26, 2020, mother filed a petition under section 388 to seek a change in the juvenile court's prior order denying reunification services. In support of her request, mother argued there had been a change in circumstances because she had recently enrolled in an outpatient substance abuse treatment program and submitted documents dated March and April 2020, showing she had enrolled in a program involving drug testing, counseling, and treatment. Mother argued that reinstatement of reunification services would be in the best interest of the children because they would have an opportunity to be raised by their natural mother.

F. *Section 366.26 Hearing*

On July 1, 2020, the juvenile court held a contested permanency selection and implementation hearing for J.C. and S.P. Both mother and father were present at the hearing. As an initial matter, the juvenile court summarily denied mother's section 388 petition, finding that she (1) failed to make a prima facie showing of changed circumstances, and (2) failed to make a showing that reinstating reunification services would be in the children's best interest. The juvenile court then proceeded to consider

permanency planning and implementation for the two children. CFS's section 366.26 reports dated January 23, 2020, and April 22, 2020, were admitted into evidence.

1. January 2020 Section 366.26 Report

CFS's January 2020 section 366.26 report recommended adoption as a permanent plan but requested a 90-day continuance to allow CFS time to ensure the children's current placement was stable for adoption. The children had recently been moved and placed with their maternal grandmother, who expressed a willingness to provide them long-term care. The report noted that mother and father had been consistent with visitation during this time period.

2. April 2020 Section 366.26 Report

CFS's April 2020 section 366.26 report recommended termination of parental rights and a permanent plan of adoption for the children. The report noted that J.C. was attending kindergarten, while S.P. was not yet of school age; it also noted that both children were healthy, up-to-date on immunizations, developmentally on track; and appeared emotionally happy to be placed with their grandparents. The report concluded that the children were likely to be adopted, since the maternal grandparents had expressed a desire to adopt the children and that other families were available and willing to also adopt.

With respect to the maternal grandparents as a prospective adoptive placement, the report detailed that the maternal grandmother and her partner were 65 and 66 years of age and in good general health. Both were previously divorced and had adult children from prior marriages. They lived together in a four-bedroom home with some of their

dependent children, and they had sufficient income to meet the children's needs. Both passed background checks with no substantiated prior child protective services referrals and no criminal history involving child abuse. The report noted that the maternal grandparents already had an existing relationship with the children, having known both children since birth and having assisted in taking care of J.C. several days a week, even prior to his removal from mother.

Finally, the report confirmed that mother and father had been consistent with visits. However, the caregiver observed that during visits, the parents did not appear to display any attachment or bond with S.P. The report noted that J.C. expressed that he enjoyed visits with his parents, but he also appeared to prefer playing with his grandfather during visitation instead of interacting with mother or father.

3. <u>Testimony of Mother and Father</u>

Mother testified that both children had been removed from her home for approximately one year, with S.P. having been removed at the time of birth. She was never employed during the five years J.C. was in her care and stated she was responsible for feeding, bathing, and playing with him. She would take him to the park and other recreational outings. She maintained regular visitation with the children after their removal, allowing her to play with them once every week for about two hours. Mother further stated that J.C. runs to her and gives her a hug at the end of each visit. With respect to S.P., mother stated she plays with, feeds, and bathes S.P., as well as changes S.P.'s diapers during visits. She disagreed with CFS's recommendation to terminate her

9

parental rights and expressed her desire for the court to consider legal guardianship instead of adoption as the permanent plan for the children.

Father testified he was the father of both J.C. and S.P. He stated that it had been approximately a year since the children were removed from him, but that he had consistently visited them about once a week. He testified that during these visits, he would play with the children and hold S.P. He believed J.C. recognized him as a father figure and claimed that J.C. would go to him for comfort whenever J.C. felt ill, sick, or harmed. Father stated he was "not going to stop fighting for [the children]," and he requested the court select legal guardianship as a permanent plan instead of adoption.

4. Juvenile Court's Findings and Orders

The juvenile court found the children were both generally and specifically adoptable. With respect to the parental bond exception, the juvenile court found that neither parent had shown that their relationship with either child rose to the level of a parental role. Based upon the evidence before it, the juvenile court concluded that the benefits of adoption for the children outweighed any benefit in maintaining the parent-child relationship with mother or father. The juvenile court then indicated it was adopting the remaining findings and orders recommended by CFS in its reports.

III. DISCUSSION

A. *Denial of Mother's Section 388 Petition Was Not an Abuse of Discretion*

On appeal, mother argues the juvenile court abused its discretion in summarily denying her section 388 petition seeking to reinstate reunification services. We disagree.

"Section 388 accords a parent the right to petition the juvenile court for modification of any of its orders based upon changed circumstances or new evidence. [Citations.] To obtain the requested modification, the parent must demonstrate both a change of circumstance or new evidence, and that the proposed change is in the best interests of the child. [Citations.] . . . [¶] To obtain an evidentiary hearing on a section 388 petition, a parent must make a prima facie showing that circumstances have changed since the prior court order, and that the proposed change will be in the best interests of the child." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478 (*Alayah J.*).) Generally, "[a] section 388 petition must be liberally construed in favor of granting a hearing to consider the parent's request." (*Ibid.*)

"We normally review the grant or denial of a section 388 petition for an abuse of discretion." (*Alayah J.*, *supra*, 9 Cal.App.5th at p. 478.) This includes situations in which the juvenile court summarily denies the section 388 petition without a hearing. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.) Additionally, even where an abuse of discretion is established, reversal is not required absent prejudice resulting in a miscarriage of justice. (*Alayah J.*, at pp. 481-482.)

Here, mother's showing of changed circumstances consisted of documentation indicating she had recently enrolled in substance abuse treatment programs. However, at the time of the dispositional hearing, there was already evidence that mother had previously overcome substance abuse issues only to relapse later. Further, there was already evidence mother had previously enrolled in a treatment program and had failed to complete it. Courts of Appeal have concluded that mere enrollment in treatment

11

programs under similar circumstances is insufficient to establish a prima facie case of changed circumstances. (*See In re G.B.* (2014) 227 Cal.App.4th 1147, 1155, 1160 [letters and certificates showing mother had enrolled in various programs not a change of circumstances where mother's willingness to participate in services was already known at time of original order]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [recent completion of a drug program not sufficient to show substantial change in circumstances where mother had a history of drug relapse].) In light of the fact that mother had previously experienced periods of sobriety followed by drug relapses and had previously enrolled in treatment programs but failed to complete them, the mere fact that mother had again enrolled in a treatment program did not, on its own, present a substantial change of circumstances in this case.

Mother filed the section 388 petition seeking services less than four months after again enrolling in a drug program. Courts have repeatedly found even longer periods of actual sobriety (as opposed to mere enrollment in a substance abuse program) insufficient to show changed circumstances when, as here, the parent has a years-long history of substance abuse and relapses. (See, e.g., *In re Clifton B.* (2000) 81 Cal.App.4th 415, 421-423 [seven months of sobriety insufficient given parent's lengthy history of substance abuse and relapses]; *In re Casey D.* (1999) 70 Cal.App.4th 38, 48 [nine months of sobriety insufficient where parent "had an extensive drug history with a tendency to engage in treatment programs when required to do so . . . and then relapse . . . ."]; see also *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real

reform."].) Absent a showing of substantial change in circumstances, it was not an abuse of discretion for the juvenile court to summarily deny mother's section 388 petition.

B. *The Juvenile Court Did Not Abuse Its Discretion in Declining to Apply the Beneficial Parent-Child Relationship Exception to Termination of Mother's Parental Rights*

Mother also argues that the juvenile court abused its discretion in declining to apply the beneficial parent-child relationship exception to termination of her parental rights. In doing so, mother does not challenge the juvenile court's finding that both J.C. and S.P. were specifically and generally adoptable; instead, she contends the trial court should have selected a permanent plan other than termination of her parental rights because she demonstrated a beneficial parent-child relationship with her two children. We do not believe the record shows any abuse of discretion.

"One of the statutory exceptions to termination [of parental rights] is contained in section 366.26, subdivision (c)(1)(B)(i), which permits the court to order some other permanent plan if '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' The exception requires the parent to prove both that he or she has maintained regular visitation and that his or her relationship with the child ' " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " ' " (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646 (*Breanna S.*).)

However, "[a] showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption. [Citation.] No

13

matter how loving and frequent the contact, and notwithstanding the existence of an ' "emotional bond" ' with the child, ' "the parents must show that they occupy 'a parental role' in the child's life." ' [Citations.] Factors to consider include ' " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " ' [Citation.] . . .'[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.] [¶] The parent has the burden of proving the statutory exception applies." (*Breanna S.*, *supra*, 8 Cal.App.5th at p. 646.)

The juvenile court's determination that the parental bond exception does not apply is reviewed under a hybrid standard of review. "Underlying factual determinations— such as whether a parent has maintained regular visitation or whether a beneficial parental relationship exists—are properly reviewable for substantial evidence. [Citations.] In contrast, a juvenile court's determination whether such a relationship provides a compelling justification for forgoing adoption 'is based on the facts but is not primarily a factual issue.' [Citation.] Rather, it is 'a "quintessentially" discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption.' [Citations.] Intrinsic to a balancing of these interests is the exercise of the court's discretion, properly reviewable for abuse." (*In re Caden C.* (2019) 34 Cal.App.5th 87, 106, italics omitted, review granted July 24, 2019, S255839.)

Here, it is undisputed mother engaged in consistent visitation with her children, but the juvenile court determined that mother's relationship with the children did not rise to the level of a parental role. Mother challenges this factual finding as a ground for reversal. Under the hybrid standard of review, this aspect of the juvenile court's order is reviewed for substantial evidence, and we conclude that substantial evidence supports the finding in this case.

At the time of the section 366.26 hearing in this case, the children had already been removed from mother's care for approximately one year. S.P. was removed at birth, and J.C. was only five years of age at the time of removal. Additionally, it was reported that the maternal grandmother actually cared for J.C. several days a week, even during the time he was in mother's custody. The caregiver observed that during visitations, there appeared to be no bond between mother and S.P., and that J.C. preferred interacting with his maternal grandparents instead of biological parents during these visits. This was substantial evidence upon which the juvenile court could reasonably rely to conclude mother's relationship with her children did not rise to the level of a "parental role." Moreover, even if mother had shown some level of a parental relationship, mother did not present any evidence that the children would suffer detriment from the termination of mother's parental rights that would justify a finding that maintaining any such relationship outweighed the Legislative preference for adoption.

Where the juvenile court concludes that the nature of the relationship between a parent and child does not qualitatively resemble that of a "parental role," the statutory exception to termination of parental rights does not apply, and there is no occasion for the

juvenile court to weigh the benefits of continuing such a relationship against the benefits of the legislative preference for adoption. Since the juvenile court's finding in this case is supported by substantial evidence, we find no abuse of discretion in the juvenile court's order terminating mother's parental rights.

C. *Mother and Father Have Not Shown A Violation of the ICWA Warranting Reversal*

Finally, both mother and father contend the matter must be remanded for CFS's and the juvenile court's failure to comply with various requirements of ICWA. Specifically, mother claims the juvenile court failed to make any ICWA findings and both parents claim that ICWA notices sent to various tribes were deficient for failure to provide information regarding "paternal great great grandparents or the paternal great great great grandfather" of the children. We find no error warranting reversal on this record.

1. Legal Background

"Congress enacted ICWA in 1978 to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement, usually in non-Indian homes. [Citation.] ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).)

The requirements of ICWA were incorporated into the Welfare and Institutions Code, which "creates three distinct duties regarding ICWA in dependency proceedings. First, from the [CFS's] initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child.

16

[Citation.] Second, if that initial inquiry creates a 'reason to believe' the child is an Indian child, then the [CFS] 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' [Citation.] Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*D.S.*, *supra*, 46 Cal.App. 5th at p. 1052.)

Following the inquiry stages, the juvenile court may make a finding that ICWA does not apply because CFS's inquiry and due diligence was " 'proper and adequate' but no 'reason to know' whether the child is an Indian child was discovered." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1050.) However, the duty to inquire is " 'an affirmative and continuing duty' " (*id*. at p. 1048) and the juvenile court " 'shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry.' " (*Id*. at p. 1050*.*)

2. Relevant Facts

On June 20, 2019 the juvenile court made an ICWA inquiry and requested that both mother and father fill out a parental notification of Indian status form. Father indicated that he "may" have Indian ancestry and identified "Cherokee" as a potential tribe. Mother indicated she "may" have Indian ancestry but simply wrote "unknown" when asked to provide any further information. Both parents listed a great-aunt, both paternal and maternal grandmothers, a godmother, and an uncle as potential family members with additional information regarding Indian ancestry.

17

On June 26, 2019, CFS contacted the maternal grandfather, who denied any Indian ancestry. CFS also contacted the paternal grandmother, who reported that her great-grandfather on her maternal side was part Yaqui Indian. Finally, CFS contacted the maternal grandmother, who denied being a registered member of any Indian tribe but reported that she believed her father had Indian ancestry linked to the Shawnee tribe.

On July 11, 2019, CFS submitted a declaration of due diligence regarding its ICWA inquiry. The declaration noted CFS had sent notices to the Bureau of Indian Affairs (BIA), as well as to eight different tribes potentially referenced in mother and father's ICWA submission and in subsequent interviews with identified relatives. The notices identified the nature of the dependency proceedings and provided identifying information for mother, father, the biological grandparents, and the biological great-grandparents. Four of the tribes and the BIA signed proofs of service confirming receipt of the notices.

On September 23, 2019, CFS submitted a new declaration of due diligence regarding its ICWA inquiry. CFS noted that it had received responses from five of the tribes that were previously given notice, with each indicating that the tribe would not be intervening because the children did not qualify for membership. This included the Pascua Yaqui tribe of Arizona. Three of the remaining tribes and the BIA did not formally respond to the notices. Based upon review of the declarations of due diligence, the juvenile court made ICWA findings that proper notice had been given, and that ICWA did not apply to the case.

3. The Alleged Failure to Make ICWA Findings is Not Supported by the Record

Initially, we note that contrary to mother's claim, the juvenile court did make explicit ICWA findings. A written order entitled, "ICWA Findings and Orders," was entered on September 23, 2019, and included findings that proper notice had been conducted as required by ICWA and that ICWA did not apply to the case. While the subsequent section 366.26 report continued to indicate that ICWA "does or may" apply, and a subsequent minute order mirrors this language, the report did not submit any additional substantive information and, therefore, did not provide any basis for the juvenile court to reverse its prior order. In reply, mother concedes that explicit ICWA findings were made and that any subsequent discrepancy referenced in the minutes appears to be in error. Accordingly, we conclude that mother's claim that the juvenile court erred by failing to issue any ICWA findings is without merit.

4. The Juvenile Court's Findings of Sufficient Inquiry Are Supported by Substantial Evidence

Mother and father also both suggest the matter must be remanded because CFS and the juvenile court failed to comply with their duty of inquiry. We disagree.

The duty to inquire under ICWA initially includes asking the child, parents, legal guardian, Indian custodian, extended family members, the party reporting abuse or neglect, or others with an interest in the child, whether the child is or may be an Indian child. (§ 224.2, subd. (b).) "[F]urther inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and State Department of Social Services; and (3) contacting tribes the child may be affiliated with,

19

and anyone else, that might have information regarding the child's membership or eligibility in a tribe." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1049; see § 224.2, subd. (e).)

A trial court's finding that ICWA does not apply includes an implicit finding that social workers fulfilled their duty of inquiry. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885.) Such a finding is reviewed for substantial evidence, and " '[w]e must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.' [Citation.] . . . [T]he appellant, 'has the burden to show that the evidence was not sufficient to support the findings and orders.' " (*Ibid.*)

Here, substantial evidence in the record supports the juvenile court's finding that CFS fulfilled its duty of inquiry and any further duty of inquiry it may have had. Both mother and father were specifically asked about their knowledge of Indian ancestry, and they were asked to identify any family members who might have information regarding Indian ancestry. In response, they identified the maternal and paternal grandmothers as persons with potential knowledge.[2] CFS proceeded to directly contact both biological grandmothers to obtain more information. It then followed up by providing written notices to each of the tribal entities potentially identified in these interviews. CFS further represented that the information provided by the grandmothers was included in these notices. Evidence that CFS took each of the steps outlined in section 244.2, subdivisions

---

[2] Both parents also identified a great-aunt but failed to provide any contact information for this individual, specify whether she was a paternal or maternal relative, or otherwise specify how she might be related to them.

(b) and (e), to conduct an initial and further ICWA inquiry constitutes substantial evidence in support of the juvenile court's finding that CFS fulfilled its duty of inquiry under the ICWA. Where substantial evidence supports the juvenile court's finding, we will not reverse its finding or order on appeal.

### 5. The ICWA Notices Were Not Deficient

Both mother and father also argue that the matter must be remanded because the ICWA notices sent in this case were deficient. Specifically, they argue that the paternal grandmother indicated that her great-grandfather was part Yaqui Indian from Arizona, but the notice to the Pascua Yaqui tribe did not include this individual's identifying information. Even assuming the duty to provide notice was triggered in this case,[3] we do not believe the record establishes that the notices actually sent were deficient.

" 'If the notice duty is triggered under ICWA, the notice to a tribe must include a wide range of information about relatives . . . .' " (*In re A.M.* (2020) 47 Cal.App.5th 303, 317.) The information to be included in any such notice is set forth in section 224.3, subdivision (a)(5). Of relevance to the claims raised in this appeal, that provision provides that notice should include: "All names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians . . . tribal enrollment information of other direct lineal ancestors of the child, and any other identifying

---

[3] CFS argues that there was no "reason to know" that either child was an Indian child triggering the duty to give formal notice under ICWA and, therefore, even if the notices were deficient, CFS acted "far beyond what was required under statute." However, it is undisputed that ICWA notices were in fact sent in this case. Because we conclude that these notices met the requirements of the statute, we need not address CFS's claim that notice was not required in the first instance.

21

information, if known." (§ 224.3, subd. (a)(5)(C).) Under the plain language of the statute, the notice must include identifying information pertaining to direct lineal ancestors *if known*.

Here, the notices included the names and various identifying information for the biological parents, grandparents, and great-grandparents of the children. Neither parent contends the information pertaining to these family members was incorrect or otherwise incomplete. Nor do the parents contend CFS failed to send notices to the correct tribes. Instead, they fault the single notice sent to the Pascua Yaqui tribe of Arizona for the failure to include identifying information regarding a paternal great-great-great-grandfather. However, nothing in the record indicates that any identifying information about this individual was actually known to CFS. The statute requires only that CFS provide information actually known, and the failure to include a specific piece of information does not render a notice defective unless the record suggests the information was known to CFS.[4]

---

[4] Almost all of the cases cited by mother are distinguishable on this basis, as they involved situations in which social workers failed to include information actually within their possession on ICWA notices. (*See In re D.T.* (2003) 113 Cal.App.4th 1449, 1455 [notices deficient for failure to include identifying information already known to social worker]; *In re Samuel P.* (2002) 99 Cal.App.4th 1259, 1266 [notice deficient for failure to provide court information and documents regarding the dependency proceeding]; *In re Louis S.* (2004) 117 Cal.App.4th 622, 631 [notice defective for providing incorrectly spelled names and birth information for dependent children]; *In re S.E.* (2013) 217 Cal.App.4th 610, 615-616 [notice defective for failing to include name of great-great-grandfather because "where the information was known, its inclusion was required"].)

22

Both mother and father argue that CFS failed to investigate, suggesting that other family members or the paternal grandmother "probably knew" the name and other information for the identified great-great-great-grandparent. However, the juvenile court made a finding that CFS fulfilled its duty of inquiry regarding the children's potential Indian status, and we have already concluded this finding was supported by substantial evidence. Further, we note that CFS's declaration of due diligence set forth the family information that the paternal grandmother was "able to provide" and noted that this information was included in the notice sent to the Pascua Yaqui tribe.[5]

Finally, we note that neither parent has shown prejudice warranting reversal. The Pascua Yaqui tribe was provided with identifying information for J.C. and S.P.'s biological parents, biological grandparents, and biological great-grandparents. In response, they disclaimed any interest in the proceedings. Neither parent has explained why or how providing information pertaining to a great-great-great-grandfather in these circumstances would produce a different result. (*See In re J.M.* (2012) 206 Cal.App.4th 375, 381 [absent explanation why the tribe "might have reached a different conclusion if

---

[5] At least one Court of Appeal has concluded under similar circumstances that such does not warrant reversal. In *In re Charlotte V.* (2016) 6 Cal.App.5th 51 (*Charlotte V.*), a mother argued defective notice under ICWA for failure to include information about a minor's grandmother and great-grandparents which social workers "could have gotten" from identified family members. (*Charlotte V.,* at p. 58.) The Court of Appeal rejected this argument, noting it was "speculative to assume" such information could have been obtained where those family members had already been "very forthcoming about [minor's] Indian ancestry" and observing, "[p]resumably, [family members] would have provided that information if it was known" and that it is "not uncommon" for an individual to be unaware of specific identifying information pertaining to grandparents and great-grandparents. (*Id.* at p. 58.)

23

it had known the names of the great-great-grandparents," failure to provide information for great-great-grandparents in ICWA notice not defective where tribe was provided information of parent, grandparents and great-grandparents and disclaimed the eligibility for membership of children].)

Accordingly, we conclude that mother and father have not established a deficiency in the ICWA notice. Where substantial evidence supports the juvenile court's finding that CFS fulfilled its duty of inquiry under ICWA, and nothing in the record suggests that CFS, the juvenile court, or any party involved in the proceedings has actual knowledge of the information mother and father claim should have been included in the notice, mother and father have not shown a defect in the ICWA notice at issue. We further conclude that even if such knowledge had appeared in the record, mother and father have not established prejudice warranting reversal.

## IV. DISPOSITION

The juvenile court's order terminating parental rights and selecting a permanent plan of adoption for S.P. and J.C. is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

24